# SUPREME COURT.

## Erastus Corning and John F. Winslow agt. The Troy Iron and Nail Factory.

Where a riparian proprietor owns on one side of and to the *center* of a stream of water, he is entitled to have the waters flow in their natural channel in the bed of the stream. This is a property-right which the law will regard as of *some value*, and which it will not suffer to be invaded or infringed without authority.

Where the defendants claimed to have acquired the right to *divert the water* of the stream in question, by an uninterrupted and hostile use thereof in the manner they then enjoyed the same, for more than twenty years before the commencement of the action for its restoration,

*Held*, that such *adverse possession* was not established, where it appeared that the defendants held under a *lease* for a term of years from the same lessors of whom the plaintiffs purchased in fee at the expiration of said lease. By taking a lease they had placed the lessors under a disability, where they could not take proceedings to oust the defendants, and which would prevent the running of the statute of limitations against them.

Neither were the plaintiffs *estopped* in equity from maintaining their action by acquiescence, or consent to the expensive improvements made by the defendants in diverting and using the waters by any prior knowledge or approval thereof by the plaintiffs, as they did not purchase the premises until the expiration of the defendants' lease, and long after the defendants' expenditures had been made,—the doctrine of estoppel therefore could not apply to the plaintiffs prior to their purchase. And the grantors of the plaintiffs were not estopped, for the reason that during their lease to the defendants they had no right to object to the defendants' improvements, and then had no present interest in the premises in dispute.

*Held*, that the alleged heavy expenditures to which the defendants would be subjected in case they were enjoined from the further use of the diverted waters, and compelled to restore the same to their natural and accustomed channel, was no objection to the relief which the plaintiffs demanded.

*Albany General Term*, September, 1860.

Gould, Hogeboom and Peckham, *Justices*.

Appeal from judgment at special term, dismissing plaintiffs' complaint without costs, and without prejudice to an action at law to recover damages for the alleged diversion of the waters of the Wynants kill.

D. L. Seymour and A. J. Parker, *for pl'ffs, appellants*.
W. A. Beach and A. B. Olin, *for def'ts, respondents*.

By the court, HOGEBOOM, Justice.   This is a suit in equity by plaintiffs to obtain an injunction against defendants, to restrain them from diverting the waters of the Wynants kill from their natural bed or channel, through or along the lands of plaintiffs, by means of a ditch or trunk, or otherwise, and from drawing and using the same by means of such diversion, and to compel the defendants to restore said waters to their natural bed or channel, and to pay the plaintiffs such damages as they have sustained by reason of such diversion, and for general relief.

The title of the plaintiffs to lands along the Wynants kill, on the north side thereof, and at least to the center of the stream, and the diversion of the waters by the defendants from their natural bed or channel, are sufficiently established by the evidence.

The defendants insist that the plaintiffs have not title opposite to their premises to the *whole* of the stream, but only to the *center;* that defendants have acquired title or the right to divert the stream by *adverse possession*, by the *acquiescence* of the plaintiffs, and by having made, with the *knowledge* and *approbation* of the plaintiffs, and their grantor, *expensive improvements*, dependent for their use and value upon the diverted water power ; that the water in its natural bed has not been appropriated by the plaintiffs to any valuable use, and is incapable of being so appropriated ; that the damages sustained by the plaintiffs, if any, are merely nominal or trifling ; that the restoration of the water to its natural bed will require considerable time, and involve ruinous expenditures to the defendants, and that therefore the facts present no case for the intervention of a court of equity.

These are the questions presented for the decision of the court.

I. I am of opinion that it is unnecessary to decide whether the plaintiffs have established a legal title to the *entire* bed of the stream opposite the seven acre lot in

question, and whether the defendants' premises on the south side extend only to the shore or bank of the Wynants kill.

1. The description of the premises conveyed to the plaintiffs by the deed of 23d July, 1852, carries the line to the south line of the farm of David DeFreest, which evidently was on the south side of the creek.

2. The exception and reservation is of " one acre of land on the *south side* of the creek, and *adjoining* to the creek where the *line* crosses the said creek." This description, although not wholly free from ambiguity, must be regarded, I think, under the decisions, as furnishing plausible reasons for limiting the territory to the *south* side of the creek, and making the side, shore or bank of the creek the boundary. But I do not deem it indispensable to determine that question in the present case.

II. At all events, the plaintiffs own to the *center* of the creek, and that entitles them to have the waters flow in their natural channel in the bed of the stream.

It is not very essential to consider to *how* valuable a use a riparian proprietor may devote the waters of a stream, when he owns only on one side and to the *center* of the stream.

Manifestly, waters thus situated, may, if there be a fall, be of some value, and the evidence is abundant, I think, that they may be made available to the owner for manufacturing purposes, and it is one of the elements of value that such an ownership places the riparian proprietor in a situation where he can advantageously negotiate with the opposite owner, or make some amicable arrangement for the erection of a dam, or for employing some other mode of using the water power. Moreover it is a property-right which the law will regard as of some value, and which it will not suffer to be invaded or infringed without authority.

The plaintiffs' title being thus established, it becomes necessary to inquire whether it has been, in any way, lost or impaired.

III. The defendants claim to have acquired the right to divert the water by an uninterrupted and hostile use of the same, in the manner now enjoyed by them, for more than twenty years before the commencement of the action. But I think they have failed to establish the *fact* of such use, and such was the opinion of the learned judge who decided this cause at the special term.

1. It is not altogether clear that the use of it by the defendants prior to 1817 was exclusive or hostile to the true owners.

2. On the 1st of· May, 1817, the defendants or their agent took a lease from the DeFreests (under whom the plaintiffs claim) of the seven acre lot in question, and of the water power for thirty-four years and nine months; under this lease they occupied and enjoyed the premises, and of course could not *originate* during that time a hostile or adverse possession.

Nor could they, during the same period, continue an adverse possession previously commenced. By taking a lease from the DeFreests, they acknowledged their title and right to convey. They held under their title, and recognized it as the true title. They must be deemed to have waived any previous and imperfect rights which they had already acquired under a previous incipient adverse possession. The doctrine of cumulative disabilities does not apply. The defendants are prevented from setting up during this period an adverse possession, not for the reason that they could not purchase an outstanding title for the purpose of perfecting their rights or quieting their possession, but because by taking a lease from the DeFreests they had placed the latter under a *disability*, in a position where they could ·not take proceedings to oust the defendants, and where of course the statute of limitations should not be permitted to run against them.

It would seem therefore entirely clear, that as this lease

did not expire until 1852, the defendants cannot avail themselves of the defence of adverse possession.

IV. Nor do I think the plaintiffs are estopped from maintaining this suit by any knowledge or approval of or consent to the expensive improvements made by the defendants.

It is undoubtedly true that both the DeFreests and the plaintiffs were cognizant of the diversion of the water at an early date, and of the building of the reservoir dam, which, with the construction subsequently of the artificial channel, had the effect to divert the water from the premises of the plaintiffs and seriously to impair the supply of water power at that point.

And it is undoubtedly true that these expenditures made by the defendants, with the knowledge, and to some extent, the concurrence and approbation of the DeFreests and the plaintiffs, were heavy, and must result in large pecuniary sacrifices to the defendants if an injunction should issue and a restoration of the waters to their natural channel be enforced.

And if the plaintiffs were in a situation where they were bound to protest against these expenditures or be forever barred; or if they occupy no other or different relation to the defendants than they did at the time these expenditures were incurred, then undoubtedly the rule contended for applies, but not otherwise.

But the fact is, that the plaintiffs occupy an entirely different position from what they did at that time, and it is their rights, in this new position, which are the subject of investigation and controversy in this action.

It was not till 1852 that they purchased the seven acre lot, and as to these premises I think the doctrine of equitable estoppel cannot be applied to them before that period. It may be true, it probably is true, that if *at that date* the defendants had matured a title or right of diversion as against the DeFreests, who were the grantors of the plaintiffs, so that an equitable estoppel then existed as to the

DeFreests, it ought also to be applied as against the plaintiffs, upon the ground that the DeFreests ought not to be allowed to convey, nor the plaintiffs under the circumstances to acquire a better title in this particular, than the De Freests themselves possessed.

But I do not see that the DeFreests were estopped, and for the reason that they had no right to object and *then* no present interest in the premises in dispute. The defendants had a lease of the premises, and the DeFreests could not know, and were not called upon, I think, to ascertain that the diversion of the waters was intended to be perpetual or permanent. The defendants did no more than they had a right to do at that time. And the DeFreests might well conclude that the expensive improvements which the defendants made, were made understandingly by the latter, in the expectation of reaping remunerative results during the long lease which they had taken, and with the intention of fulfilling their legal obligation to restore the diverted waters at the end of the term, or consummating before that period, some satisfactory arrangement with the proper parties for a continuance of the diversion after that period. This appears to me not an unreasonable presumption considering the situation and relation of the parties, and hence there is no ground for the imputation of bad faith against the DeFreests, or implied consent to the perpetual diversion of the waters, from not protesting against such diversion at the time, and it is only upon this ground that the doctrine of equitable estoppel in this case could arise.

Nor can it arise against the plaintiffs. As before stated they only took title in 1852. Before that period all the heavy expenditures had been incurred, and since that period, none which were not in execution of the plan already adopted, or against which the plaintiffs were bound to protest or be forever barred after the lapse of so short a

period as intervened between that time and the commencement of this action on the 4th of March, 1857.

I cannot concur in the suggestion that the plaintiffs may be supposed to have purchased the premises in question subject to the diversion in question, and divested of the water power. I think they intended to purchase, and did purchase all the right and title which the DeFreests owned at the time, and had it in their power to convey. Such is the legal effect of the conveyance. It must be regarded as passing not only the title to the land and the water, but the water power and all the rights and privileges which belonged to the grantors as riparian proprietors. There was no reservation whatever.

V. It remains only to consider whether the non-use or appropriation of this water power by the plaintiffs hitherto, the comparatively inconsiderable actual damage which they have as yet sustained, or even the heavy expenditures to which the defendants must be subjected in case they are enjoined from the further use of the diverted waters, and compelled to restore them to their natural and accustomed channel, present sound and insuperable objections to the relief which the plaintiffs demand. It seems to me they do not.

1. The omission or delay in appropriating the water power to available use, may perhaps be accounted for in a satisfactory manner ; may be owing to a variety of causes, and possibly in part to a disability arising from a misappropriation of it by the defendants. It cannot operate to deprive the plaintiffs of a valuable property-right.

2. Nor is the trivial character of the actual damage hitherto sustained, a controlling reason to deprive the plaintiffs of their equitable remedy. It may in fact be an argument in favor of it, if other sound reasons exist for resorting to an equity forum. The appeal to an equitable tribunal is not founded so much upon loss actually sustained, as upon apprehended injury.

3. Nor if the defendants are really in the wrong, and have been so throughout, is the fact that just reparation to the plaintiffs will involve them in heavy pecuniary sacrifices, a sound reason for a denial of justice. If the defendants have done wrong, they must repair that wrong. If they have wilfully or negligently incurred large expenditures, in anticipation of or consequent upon the misappropriation or violation of the plaintiffs' property or property rights, they must be regarded as the authors of their own misfortune. They are not at liberty to say to the plaintiffs, " justice to you is ruin to us." The serious consequences which must ensue to the defendants from granting to the plaintiffs the relief which they seek, may be a reason for enforcing the proper remedy in a way which shall be least injurious to the defendants, but not for denying it altogether.

4. In fine, the resort to an equitable forum seems consonant to the established practice in cases of this description; makes the relief final and comprehensive; avoids a multiplicity of suits, and is equally effective with an action at law in preventing the adverse possession of the defendants from ripening into a hostile and perfect title,

VI. The remaining question is, what judgment we ought to render.

This is an action on the equity side of the court, and it is not unusual to make a final determination of the action, and to grant such relief as the court below ought to have granted. This is competent for this court to do, and perhaps it is an appropriate exercise of our power to do so in the present case. All the facts are before the court, and perhaps justice can be as discreetly administered here as upon a re-trial before a single judge. In view of the injurious consequences which must ensue from a sudden withdrawal of the water from the defendants' works, and the time requisite for adapting their machinery to the changed state of affairs, I think a reasonable period should be

allowed to the defendants to make the necessary changes.

My opinion is, that the judgment of the special term should be reversed; that the plaintiffs should have their costs in the court below and in this court; that an injunction should be issued as prayed for in the complaint, and that the defendants should be compelled to restore the waters of the Wynants kill to their natural channel along the plaintiffs' premises, and that the defendants should be allowed the period of one year from the final entry of the judgment, within which to complete the restoration of the water to the natural bed of the stream along the plaintiffs' premises.

My brethren, however, are of opinion that final judgment should not be given. One of them is of opinion that the plaintiffs are estopped by acquiescence, and both conclude that as the case is one of great magnitude in its results to the defendants, and may work the most serious damage, an opportunity ought to be given to the parties to present the facts, if possible, in a different shape.

In accordance with their views the judgment must be reversed, and a new trial granted, with costs to abide the event.

PECKHAM, J., concurred, but was in favor of granting a new trial, instead of awarding final judgment.

GOULD, J., dissented, but favored a new trial in preference to final judgment for the plaintiffs.